UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GLEN R. JEFFERY, JR.,

                Plaintiff,

v.                                                Case No. 22-cv-123-pp

CAPTAIN SOBEK, *et al.*,

                Defendants.

---

**ORDER SCREENING COMPLAINT UNDER 28 U.S.C. §1915A AND DENYING AS MOOT PLAINTIFF'S MOTION FOR EXPEDITION OF THE SCREENING OF HIS COMPLAINT (DKT. NO. 4)**

---

      Glen R. Jeffery, Jr., who is confined at the Dodge Correctional Institution and who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. The plaintiff has paid the full filing fee. This decision screens his complaint, dkt. no. 1, and denies as moot his motion for expedited screening of the complaint, dkt. no. 4.

**I.    Screening the Complaint**

      A.    <u>Federal Screening Standard</u>

      Under the Prison Litigation Reform Act (PLRA), the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief

1

may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less

stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The plaintiff hah sued twenty-nine defendants. Dkt. No. 1 at 2. He alleges that on February 21, 2021, while he was a pretrial detainee at the Milwaukee County Jail, his pod was "locked down due to actions unrelated to the plaintiff." Id. at 3. The plaintiff states that he knocked on his cell window and alerted Captain Sobek that he needed to talk to a psychological social worker immediately because he was having "suicidal and homicidal ideations." Id. Sobek allegedly told the plaintiff that he would not call the social worker and that the plaintiff was okay. Id. The plaintiff alleges that he replied that he and his cellmate were having problems and were on the verge of fighting, but Sobek stated, "No you're not." Id. Next, the plaintiff's cellmate allegedly approached the plaintiff and struck him "in his upper chest cavity." Id. In response, the plaintiff allegedly smashed his cellmate's head into the wall, turned him around so they were both facing the door and then "began to try to brake [sic] and snap his cellmate's neck, to depleat the threat of his cellmate's continuous assault, on Plaintiff." Id.

The plaintiff alleges that Sobeck, Gilberto Fernandez-Rosa, Marisol Rodriguez and Kimberly Neal approached the cell and instructed the plaintiff to release his cellmate. Id. The plaintiff allegedly responded, "No, I'm not about to let dude go so we continue to fight his blood is gone [sic] be on your hands Now Sobeck." Id. Next, the plaintiff alleges that Sobeck, Fernandez-Rosa, Rodriguez,

Deputy Inspector Aaron Dobson, Captain Dittberner, Derrick Murray, Deputy Cannon, Michael James, Candice Anderson, Kimberly Johnson and Inez Nash ordered the plaintiff to let go of his cellmate. Id. at 3-4. The plaintiff allegedly refused the order because he feared that if he released his cellmate, a physical altercation could take place. Id. at 4.

The plaintiff alleges that Dobson and Dittberner had the cell door opened and Cannon sprayed OC spray in the plaintiff's face, even though he knew the plaintiff has asthma. Id. The plaintiff states that he immediately released his cellmate, reached out to stop the continuous spray of OC spray to his face, grabbed and broke the canister and prepared to comply with being restrained. Id.

The plaintiff alleges that "[u]pon information and belief," Sobek then shot his Taser gun at the plaintiff's head and the Taser gun prongs administered 50,000 volts of electricity to the plaintiff's head and right forearm. Id. According to the plaintiff, Sobek used his Taser despite having prior knowledge that the plaintiff is epileptic and has an unspecified seizure disorder. Id. The plaintiff states that "[u]pon information and belief," he began to have "multiple, and/or repetitive seizures causing plaintiff to convulse." Id. He states that during the seizures, which rendered him unconscious, Murray, James, Marisol, Jeff Amdrykowski, Jessi Kromray, Cheyenne Sarasin and Rebecca Ehrmann used force to place the plaintiff in handcuffs and leg irons by holding his hands behind his back and placing him on his stomach. Id. at 4-5.

4

The plaintiff alleges that "[u]pon information and belief," while he was on the ground having seizures Nurse Mai Burno tried to give him "O.C. aftercare" and "Taser aftercare" but that she "was unsuccessful do to plaintiff having multiple seizers that the Defendants termed as 'resisting.'" Id. at 5. The plaintiff states that Murray restrained him on the floor and requested a wheelchair, and that because he was still unconscious and seizing, Nichole Trotman brought a wheelchair for the plaintiff. Id. The plaintiff allegedly was transferred to the control unit where Nurse Practitioner Brandon Decker evaluated the plaintiff and determined that he needed to be taken to the hospital because he was unconscious and having seizures, and to have the Taser prong surgically removed from his head "due to it being fished hooked through plaintiff's skull bone." Id.

The plaintiff states that he regained consciousness and that he could not breathe because he had OC spray caked on his face and he has asthma. Id. He alleges that he began to "freak out yelling 'I can't breathe' repetitively between gulps of air." Id. Dittberner allegedly held an oxygen mask onto the plaintiff's face, which covered up the caked-on OC spray as well as plaintiff's nose and mouth and which forced the plaintiff to inhale more OC with pure oxygen. Id. at 5-6. The plaintiff alleges that, as a result, he went into a respiratory shock which rendered him unconscious. Id. at 6. As the plaintiff regained consciousness, he experienced the same suffocating feeling and yelled "I can't breathe" repeatedly. Id. Dittberner allegedly again forced the oxygen mask tightly over the plaintiff's nose and mouth which caused him to experience

5

Case 2:22-cv-00123-PP   Filed 10/17/22   Page 5 of 13   Document 5

another a respiratory shock, rendering him unconscious. Id. The plaintiff states that he regained consciousness and was conveyed to Froedtert Memorial Hospital to undergo CAT scans and have the Taser prong removed from his head. Id.

The plaintiff claims that Sobek used excessive force against him by using his Taser when the plaintiff did not demonstrate a direct threat to Sobek and because Sobek's actions caused epileptic seizures. Id. at 7. The plaintiff also claims that the defendants showed reckless disregard for his health and safety when they forced him onto his stomach to handcuff him and place leg irons on him while he was suffering seizures, and that they recklessly applied the restraints which caused damage to his hands and feet. Id. In addition, the plaintiff claims that Dittberner used excessive force and disregarded the plaintiff's health and safety when he applied an oxygen mask to the plaintiff's face, which was caked with OC spray, until the plaintiff suffocated and went into respiratory shock on two separate occasions. Id. at 8. He describes various injuries he suffered as a result of these actions. Id. at 7-8.

The plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages and costs. Id. at 9.

C. Analysis

The Fourteenth Amendment applies to excessive force claims brought by pre-conviction detainees and the standard is solely objective. Hardeman v. Curran, 933 F.3d 816, 822 (7th Cir. 2019) (quoting Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015)). "[A] pretrial detainee must show only that the

force purposely or knowingly used against him was objectively unreasonable." Kingsley, 576 U.S. at 396-97. Objective reasonableness turns on the "facts and circumstances of each particular case." Kingsley, 576 U.S. at 397 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

> A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See* [*Graham v. Connor*, 490 U.S. 386, 396 . . . (1989)]. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 . . . (1979).
>
> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *See, e.g., Graham, supra,* at 396 . . .

Kingsley, 576 U.S. at 397.

The court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officers. Id. at 399. "Running a prison is an inordinately difficult undertaking" and "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face[.]" Id. (quoting Turner v. Safley, 482 U.S. 78, 84-85 (1987); Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 324-25 (2012)). Officers facing disturbances "are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving." Kingsley, 576 U.S. at 399 (quoting Graham, 490 U.S., at 397). The court "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id. at 399-400.

The plaintiff alleges that Dobson and Dittberner directed that his cell door be opened and that Cannon sprayed him with OC spray despite knowing he had asthma. But the plaintiff admits that he had just grabbed his cellmate and smashed his cellmate's head into the wall and that he was trying to break and snap his cellmate's neck. He admits that he was told more than once, by numerous officers, to let go of his cellmate but he refused those orders.

> Orders must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

Lewis v. Downey, 581 F.3d 467, 476-77 (7th Cir. 2009) (quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984)).

> When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.

Soto, 744 F.2d at 1267.

8

Even if Dobson, Dittberner and Cannon knew that the plaintiff had asthma, they would not have had to open the cell and use OC spray if the plaintiff had followed their orders and released his cellmate. Given the severity of the security problem—the plaintiff violently assaulting his cellmate—the amount of force used (non-contact use of a chemical agent), the threat the officers likely perceived (that the plaintiff would severely injure or kill his cellmate) and the fact that the plaintiff refused to follow orders to release his cellmate, as a matter of law their use of OC spray did not constitute excessive force.

The plaintiff alleges that he immediately released his cellmate after having been sprayed with OC spray, that he grabbed and broke the canister and then that he "prepared to comply with being restrained." He says, however, that Sobek aimed his Taser at the plaintiff's head and shot him in the head and arm. The court will allow the plaintiff to proceed on an excessive force claim against defendant Sobek based on these allegations; reading the allegations in the light most favorable to the plaintiff, he was compliant at that point and there was no need for Sobek to use that degree of force. The court also will allow the plaintiff to proceed on an excessive force claim against defendants Murray, James, Rodriguez, Andrykowski, Kromray, Sarasin and Ehrmann based on allegations that they used unnecessary force while restraining the plaintiff in handcuffs and leg irons after he had been Tasered and was convulsing.

It is not clear why the plaintiff named Mai Bruno, Derrick Murray, Nichole Trottman and Brandon Decker as a defendants—he admits that Mai Bruno tried to give him care. He admits that Murray called for a wheelchair, which Trottman brought, for the purpose of taking him to be evaluated by nurse practitioner Decker. Decker decided the plaintiff needed to go to the hospital. These individuals gave the plaintiff assistance. They did not use excessive force against him (although the court is allowing the plaintiff to proceed against Murray based on the plaintiff's allegations about the force used in cuffing him while he was having seizures).

The plaintiff also claims that Dittberner used excessive force and disregarded the plaintiff's health and safety when he applied a pure oxygen mask to the plaintiff's face, which was caked with OC spray, until the plaintiff suffocated and went into respiratory shock on two separate occasions. The plaintiff has pled himself out of court on this claim. He alleges that he "began to freak out yelling 'I can't breathe' repetitively between gulps of air." Dkt. No. 1 at 5. While it is unfortunate that the OC spray present on the plaintiff's face caused adverse effects, based on the plaintiff's allegations, Dittberner may have saved his life by applying an oxygen mask to his face under the circumstances. The plaintiff does not allege that Dittberner knew that giving him oxygen through the mask would worsen, rather than improve, the situation. Even reading the allegations in the light most favorable to the plaintiff, it appears that Dittberner (however misguidedly) was trying to *help* the plaintiff, and thus

10

was not deliberately indifferent to his serious medical need. The plaintiff has not stated an excessive force or deliberate indifference claim against Dittberner.

The plaintiff does not purport to state claims against the other individuals he names as defendants. It appears that the other individuals did nothing more than tell him to let go of his cellmate. That is not excessive force.

## II. Conclusion

The court **DISMISSES** defendants Cannon, Dittberner, Dobson, Fernandez-Rosa, Neal, Thompson, Johnson, Nash, Anderson, Brendemuehl, Dziedzir, Alatorre, Brossono, Bruno, Decker, Kianderman, Resch, Wysocki, Trotman, Smith and Turner.

Under an informal service agreement between Milwaukee County and this court, a copy of the complaint and this order have been electronically transmitted to Milwaukee County for service on defendants Sobek, Murray, James, Rodriguez, Amdrykowski, Kromray, Sarasin and Ehrmann. Under the informal service agreement, the court **ORDERS** those defendants to file a responsive pleading to the complaint within 60 days.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs

who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

The court includes with this order a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

The court **DENIES AS MOOT** the plaintiff's motion for expedition of the screening of his complaint. Dkt. No. 4.

Dated in Milwaukee, Wisconsin, this 17th day of October, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**