UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GLEN R. JEFFERY, JR.,

                    Plaintiff,

        v.                                    Case No. 22-cv-123-pp

SCOTT SOBEK, *et al.*,

                    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 55) AND DISMISSING CASE

The plaintiff, who is incarcerated at Waupun Correctional Institution and is representing himself, filed a complaint alleging that the defendants violated his constitutional rights when he was confined at the Milwaukee County Jail. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on claims that the defendants used excessive force against him in violation of the Fourteenth Amendment. Dkt. No. 5 at 9. Specifically, the court allowed the plaintiff to proceed against defendant Sobek based on allegations that Sobek unnecessarily shot the plaintiff with a taser after the plaintiff already had surrendered after being sprayed with OC spray for assaulting his cellmate. Id. The court also allowed the plaintiff to proceed against defendants Murray, James, Rodriguez, Andrykowsi, Kromray, Sarasin and Ehrmann based on allegations that they used unnecessary force while restraining the plaintiff in handcuffs and leg irons after he had been tasered and was convulsing. Id.

1

The defendants have filed a motion for summary judgment. Dkt. No. 55. This order grants that motion and dismisses the case.

## I.     Defendants' Motion for Summary Judgment

### A.     Facts[1]

The plaintiff has been booked into the Milwaukee County Jail twenty different times. Dkt. No. 57 at ¶1. During the period at issue in this case, the plaintiff was incarcerated in the jail from January 8, 2019 until March 19, 2019, at which point he was transferred to the custody of the Wisconsin Department of Corrections. Id. at ¶2. On February 21, 2019, defendants Michael James, Derick Murray, Marisol Rodriguez, Cheyenne Sarasin, Jessica Kromray and Jeffrey Andrykowski worked as corrections officers, defendant Rebecca Polzin (formerly known as Rebecca Ehrmann) worked as a corrections lieutenant and defendant Scott Sobek worked as a corrections captain at the jail. Id. at ¶¶8-10.

On February 21, 2019, the entire housing unit in Pod 6B was "locked in" due to the actions of individuals who are not named in this case. Id. at ¶11. On this date, the plaintiff was having issues with his cellmate, Dawuan Robinson, due to Robinson's consistent and intentional flatulence, commissary theft and antagonistic behaviors; the plaintiff complained about his issues with Robinson to Captain Sobek. Id. at ¶13. Robinson is about 5' 7" and 150 pounds while the plaintiff is 6' 5" and 280 pounds. Id. at ¶14.

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

At about 1311 hours, Captain Sobek and Officers Murray and Rodriguez arrived outside he plaintiff's cell and observed the plaintiff holding Robinson by his neck, threatening to break his neck. Id. at ¶15; Declaration of Paul Hein, Dkt. No. 66 at ¶15, Ex. 1000 (video footage), Video 6B PTZ at 13:11:32-13:12:10.[2] At approximately 13:11:44, Robinson is observed reaching towards his neck, presumably to pull the plaintiff's arms from his neck. Dkt. No. 57 at ¶16; Ex. 1000, Video 6B PTZ at 13:11:44.

According to the plaintiff, after he explained that Robinson was stealing his commissary items, flatulating repetitively and threatening him, Sobek said, "you two are both grown men, and should learn how to deal with your problems. I'm not going to move you, you guys are going to just do what you have to do." Dkt. No. 79 at ¶7. The plaintiff states that as he was talking with "the CO," Robinson attacked him without provocation while the COs stood by watching. Id. at ¶8. According to the defendants, Sobek attempted to deescalate the situation by attempting to calmly dialogue with the plaintiff in an effort to gain voluntary compliance from him and ordered him to release Robinson. Dkt. No. 57 at ¶17; Ex. 1000, Video 6B PTZ at 13:11:58-13:14:20.

---

[2] The defendants' Exhibit 1000 contains several videos of events that took place at the Milwaukee County Jail on February 21, 2019. The videos are titled: (1) 2.21.19 6B1; (2) 2.21.19 6B2; (3) 2.21.19 6B entry; (4) 2.21.19 6B PTZ; (5) 2.21.19 6th Elev Vestibule; (6) 2.21.19 6th Floor; (7) 2.21.19 Crt Stg Cor 1; and (8) 2.21.19 Prebooking Slider. Videos 6B1, 6B2 and 6B PTZ show footage of the main incidents giving rise to the plaintiff's claims from different angles. The time stamps on Videos 6B1 and 6B2 are about sixteen seconds behind the time stamp on Video 6B PTZ. So, for example, on Video 6B PTZ, the plaintiff's cell door opens at about 13:18:01; on Videos 6B1 and 6B2, the plaintiff's cell door opens at about 13:17:45.

3

The defendants state that Sobek repeatedly ordered the plaintiff to release Robinson, but the plaintiff refused all orders and would not release Robinson. Dkt. No. 57 at ¶18. According to the plaintiff, he "expressed that he would release Robinson when the door opened so that the physical altercation did not continue, as [the plaintiff] did not want to harm Robinson nor be harmed[.]" Dkt. 80 at ¶18.

At 13:13:41, Robinson's head is observed in the cell window under the plaintiff's chin; the plaintiff still was holding Robinson by his neck. Dkt. No. 57 at ¶21; Ex. 1000, Video 6B PTZ at 13:13:41. Officer James responded to the call for assistance due to the plaintiff threatening to harm and holding Robinson hostage and arrived on scene at approximately 1313 hours. Dkt. No. 57 at ¶22; Ex. 1000, Video 6B PTZ at 13:14:14. James observed the plaintiff holding Robinson up in front of the cell window, making threats to kill Robinson and refusing to comply with Officer Cannon's and Sobek's orders to release Robinson. Dkt. No. 57 at ¶23.

The plaintiff was afforded an opportunity to speak with a psychiatric social worker while he was still holding Robinson by the neck. Id. at ¶24; Ex. 1000, Video 6B PTZ at 13:14:49. Additional backup continued to arrive and at about 1315 hours, Captain Dittberner and Inspector Dobson arrived on scene. Dkt. No. 57 at ¶25; Ex. 1000, Video 6B PTZ at 13:15:56. The plaintiff continued his grip around Robinson's neck. Dkt. No. 57 at ¶26; Ex. 1000, Video 6B PTZ at 13:16:10-13:16:15.

4

At 13:16:19, the plaintiff is visible in his cell window, still holding Robinson by the neck, as Dittberner begins dialogue with the plaintiff. Dkt. No. 57 at ¶27; Ex. 1000, Video 6B PTZ at 13:16:19. Dittberner introduced himself and asked the plaintiff to release Robinson and come out of his cell peacefully; the plaintiff responded by stating, "I'm in too deep Dittberner. I will snap his fucking neck." Dkt. No. 57 at ¶28. Dittberner observed the plaintiff then slam Robinson's head into the cell door twice, while stating "I'm going to kill him." Id. at ¶29. The plaintiff concedes that he had "grabbed [his cellmate] and bashed his head against the wall before the cell door was opened." Id. at ¶30.

Robinson was trying to escape from the plaintiff's grip by grabbing and biting his arms, wiggling his body and kicking his feet. Id. at ¶31. The plaintiff claims that his intent was to hold Robinson's chin with his hand in a neck snapping motion until the plaintiff's cell door was opened. Id. at ¶32. The plaintiff was warned that he would be tased if he did not release his grip on Robinson. Id. at ¶33. The responding officers at the scene—including Sobek, Dittberner, James, Murray and Rodriguez—believed the plaintiff was going to kill Robinson. Id. at ¶34.

A hostage situation is perhaps one of the most significant and imminent threats to safety and security of the jail and its occupants, and it requires prompt intervention. Id. at ¶39. It was unusual for Dittberner and Dobson to be present during jail disturbances, but the severity of the situation required added supervisory staff present. Id. at ¶40. A person's life was at risk. Id. After the plaintiff refused multiple orders to release Robinson and threatened to kill

5

Robinson multiple times over the course of about seven minutes, Dittberner and Dobson discussed next steps, and at approximately 1317 hours, the decision was made to enter the cell in an effort to save Robinson's life; the need to physically intervene in this life-or-death situation was urgent and apparent. Id. at ¶41; Ex. 1000, Video 6B PTZ at 13:17:25.

Prior to any use of force, the plaintiff was ordered multiple times to release Robinson, but he did not comply. Dkt. No. 57 at ¶42. Dobson, who has more than twenty years' experience as a sworn law enforcement officer, observed the plaintiff choking Robinson, which he knows can lead to brain damage and/or death within minutes. Id. at ¶43. Because the luxury of time was not on the officers' side, Dobson and Dittberner rapidly devised a tactical cell entry plan, which took into account the risk of safety to Robinson's life, the time that had elapsed since the plaintiff first took ahold of Robinson, the munitions readily available and the staff members available to assist. Id. at ¶44.

The plan was to have a skilled weapons officer spray OC spray into the cell immediately upon opening the door so that the plaintiff would become disoriented and his eyesight would be temporarily diminished. Id. at ¶45. The officers also planned to have the corrections captain present on the scene, Sobek, deploy his taser as soon as he had a target opening that would incapacitate only the plaintiff and not harm Robinson. Id. Based on Dobson's training, education and experience, he believed that the use of both of these non-lethal weapons would incapacitate the plaintiff while simultaneously

6

forcing his release of Robinson so they could safely remove Robinson from the hostage situation and get him medically treated. Id. at ¶46.

After all officers took their positions, at approximately 13:18:01, Dobson opened Cell 13's door, and one second later, Cannon deployed OC spray directly into the plaintiff's face after he refused to release Robinson. Id. at ¶47; Ex. 1000, Video 6B PTZ at 13:18:01-13:18:05. When Cannon started spraying the OC spray, the plaintiff still had hold of Robinson and would not release him; this was particularly dangerous because the plaintiff could use Robinson as a shield against the officers' weapons. Dkt. No. 57 at ¶48. The plaintiff testified that after he was sprayed, he looked away because the OC spray was sprayed a close distance from his face, that he could not see through the pepper spray and that he did not know what was going on. Id. at ¶49.

According to the defendants, it did not appear as if the effects of OC spray impacted the plaintiff much, if at all, and he retained his grip on Robinson. Id. at ¶51. According to the plaintiff, while being sprayed he released Robinson because his life was not in danger anymore from Robinson. Dkt. No. 80 at ¶51.

According to the defendants, Sobek attempted to reach an angle to deploy his taser that would not strike Robinson but would hit the plaintiff in his center mass as that location has the best chance to incapacitate an individual. Dkt. No. 57 at ¶52. The defendants state that after Sobek had a feasible angle and was positioned in front of Cannon to prevent any accidental impact with him, he aimed at the plaintiff's center body mass and deployed his

7

taser, which was about two to three seconds after the OC spray first was presented. Id. at ¶53; Ex. 1000, Video 6B PTZ at 13:18:01-13:18:05. The defendants state that the plaintiff bent forward as the taser prongs projected forward, causing them to strike the plaintiff in his head and right arm, which caused neuro muscular incapacitation, and the plaintiff let go of Robinson and fell to the floor. Dkt. No. 57 at ¶54; Ex. 1000, Video 6B PTZ at 13:18:04-13:18:06. At 13:18:06, Robinson is seen escaping from the plaintiff's grip and fleeing to the rear wall of the cell while the plaintiff is falling to the cell floor on his left side. Dkt. No. 57 at ¶55; Ex. 1000, Video 6B PTZ at 13:18:06.

According to the plaintiff, Sobek intentionally shot him in the head with the taser. Dkt. No. 80 at ¶52. The plaintiff states that Cannon sprayed his OC spray for five to eight seconds, the plaintiff released Robinson and "voiced that [he] gave up and proceeded to bend forward to get on the ground in submission[.]" Id. at ¶53. He says that after being sprayed with OC spray, he "immediately became compliant voiced his surrender stating 'Okay, Okay, I give up, I'm getting down,' then proceeded to bend forward to the ground to surrender in earnest." Dkt. No. 88 at ¶10. The plaintiff states that he "had voiced his surrendering once his cellmate was of no threat to his safety, after being OC sprayed for 5 seconds prior to Sobek shooting [the plaintiff] in the head [the plaintiff] was compliant." Dkt. No. 80 at ¶54.[3] According to the

_____

[3] The plaintiff disputes that he let Robinson go at 13:18:06 and says that he let him go at 13:17:49-13:17:50. Dkt. No. 80 at ¶55. The plaintiff cites to a discovery response that says that "at approximately 13:17:50-13:17:52, Mr. Robinson appears to have been released from Plaintiff's grip and was able to flee from Plaintiff." Id.; Dkt. No. 81-1 at 7. However, that discovery response

8

defendants, at no point prior to the deployment of Sobek's taser did the plaintiff raise his hands or otherwise indicate he was surrendering. Dkt. No. 57 at ¶58.

It is undisputed that James pulled the plaintiff out of Cell 13 by his feet. Dkt. No. 57 at ¶56; Ex. 1000, Video 6B PTZ at 13:18:20. Murray then escorted Robinson out of the cell and away from the plaintiff so he could receive medical attention. Dkt. No. 57 at ¶57; Ex. 1000, Video 6B PTZ at 13:18:25.

Negotiations with the plaintiff, though unsuccessful, lasted about six and a half minutes. Dkt. No. 57 at ¶60. The time from the cell door opening until Robinson is free from the plaintiff's grip was about five seconds. Id.; Ex. 1000, Video 6B PTZ at 13:11:57-13:18:07. The plaintiff testified at his deposition that if the officers "did not open the door and get [Robinson] out of there. I was not going to let – I was going to deplete him by any means physically." Dkt. No. 57 at ¶61. When asked if he had the ability to seriously injure Robinson, the plaintiff described a variety of techniques he could have utilized to seriously injure and/or kill Robinson. Id. at ¶62.

James attempted to secure the plaintiff's legs, but he was unsuccessful. Id. at ¶63; Ex. 1000, Video 6B PTZ at 13:18:21-13:18:33. According to the defendants, the plaintiff became very resistant by yelling, kicking his legs and refusing to put his hands behind his back. Dkt. No. 57 at ¶64; Ex. 1000, Video

---

cites to video taken from camera 2, which is Video 6B2. As stated above, the time stamp from Video 6B2 is about sixteen seconds behind the time stamp from Video 6B PTZ. Thus, when it was 13:17:50-13:17:52 on Video 6B2, it was 13:18:06-13:18:08 on Video 6B PTZ. The times are consistent.

6B PTZ at 13:18:22-13:18:55. According to the plaintiff, he was "seizing, where the muscles involuntarily lock up, limbs jolt out, and involuntary sounds escape the mouth." Dkt. No. 80 at ¶64. James then secured the plaintiff's right arm and, finally, Murray was able to handcuff the plaintiff, which was done to ensure the safety of the officers present as well as the medical staff who were trying to provide the plaintiff with OC and taser aftercare. Dkt. No. 57 at ¶65; Video 6B PTZ at 13:18:22-13:20:20. After being cuffed, the plaintiff was rolled over onto his back; however, his legs were not yet secured. Dkt. No. 57 at ¶66; Ex. 1000, Video 6B PTZ at 13:19:17-13:20:11.

According to the defendants, the plaintiff continued to resist multiple officers' attempts to secure him while medical personnel attempted to treat him. Dkt. No. 57 at ¶67; Ex. 1000, Video 6B PTZ at 13:20:13-13:21:45. Specifically, James secured his right arm, and Rodriguez applied a Velcro belt around the plaintiff's legs while awaiting proper metal ankle restraints because the plaintiff continued to deliberately kick and tense up his body. Id. 68. Officer Sarasin arrived on scene at approximately 1321 hours and witnessed the other officers struggling to secure the plaintiff's legs as he physically resisted their attempts to restrain him, so she assisted the other officers by securing the plaintiff's left leg, which was in only a Velcro strap at the time; Sarasin could hear the plaintiff yelling and felt him actively resist against her pressure to secure him. Dkt. No. 57 at ¶68; Ex. 1000, Video 6B PTZ at 13:21:08-13:21:45. According to the plaintiff, he never was resisting but was seizing, not in control

of his muscle movements, "nonconscious" and unable to comply with orders. Dkt. No. 80 at ¶68.

Lieutenant Polzin arrived on scene at approximately 1321 hours and witnessed officers struggling to secure the plaintiff's legs into restraints because the device would not latch. Dkt. No. 57 at ¶69; Ex. 1000, Video 6B PTZ at 13:21:39-13:25:36. Multiple officers continued to struggle to secure the plaintiff for several minutes as medical staff treated him. Dkt. No. 57 at ¶70; Ex. 1000, Video 6B PTZ at 13:21:45-13:26:32. Sarasin removed the plaintiff's sock for medical staff to take vitals from his toe. Id. Polzin and Sarasin attempted to restrain the plaintiff's legs in leg irons, but the metal leg restraints were not working so they removed them. Dkt. No. 57 at ¶71; Ex. 1000, Video 6B PTZ at 13:23:21-13:26:53.

James and Murray and others assisted the plaintiff off the floor and into a wheelchair so he could be escorted out of the housing unit and transported to a hospital for taser aftercare. Dkt. No. 57 at ¶73; Ex. 1000, Video 6B PTZ at 13:25:35-13:27:41. Polzin escorted the plaintiff out of the housing unit and to the ambulance that was going to take him to the hospital. Dkt. No. 57 at ¶75.

None of the defendants or responding law enforcement were aware that the plaintiff had epilepsy or any restrictions in place that would prevent the use of a taser. Dkt. No. 57 at ¶80. According to the defendants, the officers who restrained the plaintiff (James, Murray, Polzin, Rodriguez and Sarasin) did not observe him convulsing at any time. Id. at ¶81. According to the plaintiff, the officers could see that he was seizing. Dkt. No. 80 at ¶81.

According to the defendants, the need to place the plaintiff into restraints was evident based on his violent behavior just moments prior to being restrained, his deliberate physical resistance, his well-known history of violent behavior, his great physical strength and size and his ability and willingness to threaten the safety and security of the jail. Dkt. No. 57 at ¶83. According to the plaintiff, he was having a medical emergency, he does not have a violent history at the jail and he cannot help how he was born with physical size and strength. Dkt. No. 80 at ¶83.

The jail's medical personnel remained near the plaintiff from about 1314 hours until he was escorted down the hall toward the ambulance, at which point Milwaukee Fire Department personnel were with him. Dkt. No. 57 at ¶91. The plaintiff's medical records from February 21, 2019 state:

> Pt. presented disheveled w/ angry mood and hostile presentation. Pt. was surround[ed] by security staff attempting to deescalate pt who had his cell-mate in a hold at the head and essentially creating a hostage situation. Pt. stated 'I got things I've got to do…I'm already down deep!' Pt. continued – 'I've been locked in here 3 days.' Facility was undergoing shakedown prior to this event per security staff. Pt. was redirected by MH Supervisor, Kiser and pt. would not relent. Pt. was forced out of cell by security and pt. was assessed by medical. Pt. conveyed by Milwaukee Fire Dept. to area hospital for further evaluation. Pt. to be placed on restraint watch per security in housing unit 4D upon return.

Dkt. No. 57 at ¶92. Medical records from this date further reflect:

> Writer arrived to POD after call was made for additional medical needed on scene. Upon arrival, patient was lying prone with several officers holding him to the floor while he was being cleaned with normal saline by RN Bruno on his face and right arm. Patient was flailing around the floor and not cooperating with medical staff. A taser probe was left in the top of patient's head. RN Bruno reported she was not able to remove the probe. Writer attempted to remove probe with 4x4 gauze but was not successful. NP Decker attempted

12

next without success. Writer was not able to perform any care due
to patient's combativeness.

Id. at ¶93. When seen later in the evening on February 21, 2019, the plaintiff
did not complain about any alleged seizure or breathing complications. Id. at
¶94. The plaintiff was diagnosed with a seizure disorder around 2014, but was
not taking medication for that disorder in 2019. Dkt. No. 57 at ¶95.

     B.   <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there
is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Federal Rule of Civil Procedure 56(a); <u>see</u> <u>also</u>
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 324 (1986); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d
665, 668 (7th Cir. 2011). "Material facts" are those under the applicable
substantive law that "might affect the outcome of the suit." See <u>Anderson</u>, 477
U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be, or is, genuinely disputed must
support the assertion by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of
> the motion only), admissions, interrogatory answers, or other
> materials; or

> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

13

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.    <u>Discussion</u>

The defendants contend that Sobek used reasonable force when he deployed the taser on the plaintiff. Dtk. No. 56 at 14, 21. They also contend that the defendants who tried to restrain the plaintiff outside his cell used reasonable force. <u>Id.</u> The defendants assert that they are entitled to qualified immunity because they acted reasonably under the circumstances. <u>Id.</u> at 23. The plaintiff maintains that factual disputes preclude summary judgment for the defendants. Dkt. No. 78 at 1. He argues that Sobek tasered him after he had surrendered, which amounted to unreasonable force. <u>Id.</u> at 11. The plaintiff also contends that the defendants used unreasonable force because they applied excessively tight handcuffs when he was seizing. <u>Id.</u> at 16.

The Fourteenth Amendment applies to excessive force claims brought by pre-conviction detainees and the standard is solely objective. <u>Hardeman v. Curran</u>, 933 F.3d 816, 822 (7th Cir. 2019) (quoting <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 396-97 (2015)). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." <u>Kingsley</u>, 576 U.S. at 396-97. Objective reasonableness turns on the "facts and circumstances of each particular case." <u>Kingsley</u>, 576 U.S. at 397 (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).

A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See* [*Graham v. Connor*, 490 U.S. 386, 396 . . . (1989)]. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 . . . (1979).

Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *See, e.g., Graham, supra*, at 396 . . . .

Kingsley, 576 U.S. at 397.

The court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officers. Id. at 399. "Running a prison is an inordinately difficult undertaking" and "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face[.]" Id. (quoting Turner v. Safley, 482 U.S. 78, 84-85 (1987); Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318, 324-25 (2012)). Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Kingsley, 576 U.S. at 399 (quoting Graham, 490 U.S., at 397). The court "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference

15

to policies and practices needed to maintain order and institutional security is appropriate." Id. at 399-400.

At screening, the court determined that the plaintiff did not state an excessive force claim based on his allegations that Dobson and Dittberner directed that his cell door be opened and that Cannon sprayed him with OC spray despite knowing he had asthma. Dkt. No. 5 at 8.

> [T]he plaintiff admits that he had just grabbed his cellmate and smashed his cellmate's head into the wall and that he was trying to break and snap his cellmate's neck. He admits that he was told more than once, by numerous officers, to let go of his cellmate but he refused those orders.
>
>> Orders must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.
>
> Lewis v. Downey, 581 F.3d 467, 476-77 (7th Cir. 2009) (quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984)).
>
>> When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.
>
> Soto, 744 F.2d at 1267.
>
> Even if Dobson, Dittberner and Cannon knew that the plaintiff had asthma, they would not have had to open the cell and use OC spray if the plaintiff had followed their orders and released his cellmate. Given the severity of the security problem—the plaintiff violently assaulting his cellmate—the amount of force used (non-contact use of a chemical agent), the threat the officers likely perceived (that the plaintiff would severely injure or kill his cellmate)

16

and the fact that the plaintiff refused to follow orders to release his cellmate, as a matter of law their use of OC spray did not constitute excessive force.

Dkt. No. 5 at 8-9.

The plaintiff contends that Sobek acted unreasonably by deploying the taser because the plaintiff had surrendered and started to get down on the ground prior to Sobek deploying the taser. The video of the incident does not support the plaintiff's version. Contrary to the plaintiff's assertion that he surrendered after the OC spray but before the taser deployment, the video shows that about six seconds after the cell door opened, the plaintiff fell backwards at which time Robinson got free from the plaintiff and fled to the back of the cell. See Ex. 1000, Video 6B PTZ at 13:18:01-07. The plaintiff did not surrender; he fell back after being hit by the taser, at which time he released Robinson. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 378-81 (2007).

Even if the plaintiff had surrendered after being sprayed with OC spray but before Sobek deployed the taser, the OC and taser deployment happened in rapid succession, as planned by Dobson and Dittberner, and did not allow time for Sobek to appreciate that the plaintiff no longer posed a threat. See Ex. 1000, Video 6B PTZ at 13:18:01-13:18:07; see Abbott v. Sangamon County, Ill., 705 F.3d 706, 733 (7th Cir. 2013) (an officer will not be held liable if the

17

circumstances under which for was used evolved so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force); see also Johnson v. Scott, 576 F.3d 658, 660 (7th Cir. 2009) (officer not required to take apparent surrender at face value, and officer had no idea how suspect would behave once he was cornered).

Under the circumstances, a reasonable factfinder could not conclude that Sobek used unreasonable force when he deployed his taser on the plaintiff. Regardless of the nature the plaintiff's disagreement with Robinson—or who started it—it is undisputed that the plaintiff threatened to kill Robinson. Over the course of about seven minutes, jail security staff, medical staff and administrative staff tried to persuade the plaintiff to let go of Robinson and the plaintiff refused. The plaintiff says that he told Sobek he would let go only if the cell door was opened. The plaintiff told other staff that he would not let go of Robinson and that he was "in too deep." The plaintiff held Robinson by his neck, threatened to snap his neck and said that he was going to kill Robinson. The plaintiff slammed Robinson's head twice against the cell door. The plaintiff was warned that he would be tased if he did not let go of Robinson. After the plaintiff's repeated refusals to let go of Robinson and jail staff members' increasing fear that he was going to kill Robinson, Dittberner and Dobson devised a plan to open the cell door, spray OC spray at the plaintiff and then deploy a taser at him. They implemented that plan. Staff safely retrieved Robinson from the cell, restrained the plaintiff, provided him with medical treatment and transported him to the hospital for taser aftercare.

18

The use of a taser in the situation that Sobek and the other jail staff members were confronted with was reasonable and permissible use because the plaintiff posed an immediate threat to safety and order within the jail. See Forrest v. Prine, 620 F.3d 739, 745 (7th Cir. 2010) (citing Lewis, 581 F.3d at 477-78 ("In a jail or prison setting, it is not hard to imagine any number of scenarios that would justify the [use of] . . . taser guns.")). The plaintiff contends that it was unreasonable to use the taser against him because he has a seizure disorder, but he has not submitted evidence to show that the defendants knew he had a seizure disorder on the date of the incident. Even if he had, the plaintiff could have avoided being shot with a taser by complying with the orders to release Robinson. Again, the plaintiff was warned that a taser would be used against him if he did not release Robinson. See id. (citing Kinney v. Ind. Youth Ctr., 950 F.2d 462, 466 (7th Cir. 1991) (affirming summary judgment dismissal of the plaintiffs' excessive force claims against officer because officer gave the plaintiffs verbal warnings to stop or be shot)).

The plaintiff also contends that Sobek acted unreasonably because one of the taser prongs went into the plaintiff's head; he concludes that this means that Sobek was aiming at his head. The other taser prong went into the plaintiff's arm. A fact finder could not reasonably infer that Sobek intentionally shot the plaintiff in the head with one of the taser prongs. Given the overall circumstances—a cell entry involving multiple officers to potentially save Robinson's life, aiming the taser to avoid hitting Robinson and any other officers and the plaintiff's movements once the cell door opened—the only

19

reasonable inference from the plaintiff getting hit in the arm and the head with the cell prongs is that it was a natural consequence of the situation. See Forrest, 820 F.3d at 745-46 (unreasonable to infer that officer meant to hit plaintiff near the eye with taser, given overall circumstances). The court will grant the defendants' motion for summary judgment as to defendant Sobek.

The plaintiff contends that the remaining officers used excessive force because they unnecessarily used handcuffs on him after pulling him from the cell. The plaintiff states that he was not resisting the defendants' attempts to restrain him but was suffering from seizures and the defendants used unnecessary force in placing restraints on him. The video evidence does not support the plaintiff's contention that any defendant used excessive force. The video shows that security staff and medical staff were surrounding the plaintiff in the minutes after he was removed from the cell. Security staff restrained the plaintiff before medical staff treated him and then he was transported to the hospital. Minutes before, the plaintiff had held his cellmate hostage, threatened to kill him and slammed his cellmate's head against the cell door. It would have been unreasonable and reckless not to secure the plaintiff before allowing medical staff to assess and treat him, even assuming he was suffering from seizures. The record, including the video evidence, does not support a finding that any defendant used unreasonable force in restraining the plaintiff after he was removed from the cell.

The defendants are entitled to summary judgment. The court will grant the defendants' motion and dismiss this case.[4]

## II. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 55.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the

---

[4] Because the court is granting the defendants' motion for summary judgment on the merits, it will not address their claim that they are entitled to qualified immunity.

full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 6th day of September, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

22